HELENE SCHWABACH, Respondent, v BETH ISRAEL MEDICAL CENTER, Appellant, et al., Defendants.

First Department, January 29, 1980

## APPEARANCES OF COUNSEL

*Thomas R. Newman* of counsel *(Arthur N. Seiff* with him on the briefs; *Bower & Gardner,* attorneys), for appellant.

*Howard B. Sherman* of counsel *(Schneider, Kaufman & Sherman,* attorneys), for respondent.

### OPINION OF THE COURT

BLOOM, J.

Plaintiff, then 86 years old, was admitted to Beth Israel Hospital on April 19, 1976 at the direction of her private physician. She was found to be suffering from cardiac arrythmia and a pacemaker was successfully implanted on April 29, 1976. Following the operation, which was uneventful, she was taken to the hospital's intensive care unit where she remained until May 1, 1976. On that day she was transferred, by wheelchair, to another floor.

During her stay in the intensive care unit, plaintiff became confused and extremely agitated. This condition, we are informed, is not unusual in patients, particularly elderly ones, introduced into the environment of an intensive care unit. Plaintiff screamed, flailed her arms about, tried to pull out her intravenous tubes and cardiac monitors, bit a nurse and struck a doctor who was endeavoring to assist her. Sedation was ineffective for more than brief periods. Because of the danger of dislodging the pacemaker, thus causing cardiac arrest, it became necessary to place restraints upon her wrists.

The restraints used in this case were known as the Kerlix and consisted of four by nine padding in the Kerlix roll. The padding was placed around the plaintiff's wrists, the Kerlix

put around the padding and the Kerlix was then tied to the side of the bed. While there is a commercial restraint in use at the hospital known as the Posey restraint, none was then available in the intensive care unit, although they may have been available in other parts of the hospital.

In accordance with the hospital's procedures, plaintiff was examined upon her transfer from the intensive care unit to her room. The hospital records indicate that upon that examination, it was first noted that plaintiff was suffering from a left wrist drop. Some two days later, her surgeon recommended a neurological consultation which established damage to the radial nerve at or above elbow level. As a result, plaintiff was not able to extend her wrist. It hung limply. At the time of her discharge from the hospital, there was no evidence of the recovery of new function and the prognosis for further recovery remained guarded.

Thereafter, this action was commenced. It resulted in a verdict in favor of plaintiff and against the hospital in the total sum of $82,432, $10,000 of which was allocated to pain and suffering, $5,432 to hospital care and the balance of $67,000 to past and future full-time nursing care which, it is asserted, plaintiff will require for the balance of her life.

The question of negligence was a strongly contested one. The plaintiff's medical expert, Dr. Davidson, had neither treated nor examined the plaintiff. Moreover, he was a surgeon and not a neurologist. He acknowledged that, in the circumstances indicated by the hospital records, the use of restraints was probably necessary. While he was of the opinion that Posey restraints were preferable to Kerlix restraints, he stated that the use of the latter was medically sanctioned and their use for short periods would constitute good judgment if the Posey restraints were not immediately available. The entries in the hospital record indicated the application of the Kerlix restraints on six occasions on April 30 and May 1, 1976. They do not indicate when they were removed. Sedatives were given during this two-day period and the records reflect that during much of the time plaintiff slept or rested peacefully.

Dr. Davidson expressed the opinion that the records were incomplete based upon plaintiff's condition as reflected in those records. He concluded that the direct cause of damage to plaintiff's left radial nerve was the extended use of the Kerlix restraint. Based upon hypotheses presented to him and with-

out ever having examined the plaintiff's left wrist he further concluded that the damage to it was total and permanent.

■ While the issue of negligence was a close one, we hold that, on balance, it was properly a matter for the jury. The attack on the opinions voiced by Dr. Davidson went to the credibility of those opinions. That was a question within the purview of the jury and was properly left to it.

■ The trial court's charge presents a more serious problem. A number of requests similar to those normally included in the charge in a case of this sort were refused. Standing alone, this refusal may not have been sufficient to warrant reversal. However, when coupled with other errors connected with the charge, a retrial is mandated.

At the request of counsel for the hospital the report of the Medical Malpractice Mediation Panel was received in evidence and read to the jury. In pertinent part it read: "With respect to the medical malpractice claim of the plaintiff against the defendant Beth Israel Medical Center, we find there is no liability on the part of said defendant".

The court, in charging the jury on the effect of that recommendation, noted that:

"[i]f it [the Medical Malpractice Mediation Panel] agrees upon a recommendation of liability, which it did in this case, then, under the law, that recommendation is admissible in evidence *. * *

"You may accept or reject the recommendation of the panel".

While the report itself was in evidence we cannot determine what the effect of this clearly accidental misstatement that the Medical Malpractice Mediation Panel had agreed that the hospital was liable had upon the jury.

Subsequent to the submission of the case to it, the jury sent a note to the court which read as follows: "Is a hospital liable for any injury to the patient while in its intensive care unit"?

It is apparent from the question that the jury's thinking centered about the need for proof of causal relationship or whether, in light of the charge on *res ipsa loquitur* such proof was necessary. The somewhat obscure response by the court was: "All right, the only injury that is claimed in this case is the injury to the left radial nerve and none other".

He then sent the jury back to continue its deliberations.

That the court's supplemental charge did little to clarify the

issue for the jury is manifest from its second note which followed shortly more than an hour thereafter. The question there propounded was:

"We are in agreement that an injury to the radial nerve occurred to this plaintiff while in the intensive care unit.

"For the hospital to be liable, is it necessary to agree that this wrist restraint caused this injury?

"Are we limited to consider the wrist restraint only as the causative agent of the injury to the plaintiff's radial nerve"?

In response to the question the court reread somewhat more than five and one-half pages of its original charge covering negligence and standard of care, the doctrine of *respondeat superior, res ipsa loquitur* and other matters. Included in this supplemental charge was a five-line paragraph defining generally the doctrine of proximate cause. Nowhere was there a *specific* answer to the jury's inquiry.

Here, the jury, after the initial charge had been read to it, made clear its confusion and requested enlightenment on a specific matter. Their inability to relate the facts in issue to the law as charged to them is indicated by the questions propounded shortly after receiving the court's original charge. When, as in this case, the jury pinpoints their lack of understanding they are entitled to something more than that which led to their original confusion. They should have been instructed on the precise subject upon which they manifested their doubt *(Kramer v Chatham Green, Inc.,* 38 AD2d 931; *People v Botteri,* 50 AD2d 540; *Sanabria v City of New York,* 42 AD2d 615).

Since we are remanding for a new trial, a comment on damages is appropriate. The plaintiff was not present at the trial. Hence, the jury did not have the opportunity to see her wrist and to determine for themselves the degree of her disability. The nature and permanency of the injury was predicated upon the testimony of a friend and the opinion of Dr. Davidson that the condition was permanent. Yet the record discloses that by the end of 1976 she had resumed playing the piano. While the testimony discloses that "it was not near a normal fashion, no, but she did start playing some", it is a matter of common knowledge that the playing of the piano requires some manual dexterity and some wrist flexion even when the work product is less than pleasing to the ear.

The largest portion of the damages awarded was based upon the hypothesis that plaintiff would never again be able to care for herself and would need constant nursing attention because of the injury to her wrist. However, plaintiff was twice admitted to the hospital subsequent to the admission which forms the basis for this suit and prior to the trial of this action. Both were from wholly unrelated ailments. The first occasion was some two years three months later and the second approximately two years six months later. On each occasion she was given a neurological examination upon her admission. The first such examination indicated "no sensory motor abnormalities" while the second reflected a "strong grip bilat". In light of the advanced age of plaintiff and the frailty normally attendant thereon, the jury's conclusion that plaintiff's problems stem from the injury is open to grave question. Were we not remanding the case for a new trial we would have reduced plaintiff's damages substantially.

Accordingly, the judgment of the Supreme Court, New York County (WILLIAMS, J.), entered January 30, 1979, is reversed on the law and the case is remanded for a new trial with $75 costs and disbursements of this appeal to abide the event.

SANDLER, J. (dissenting). I have a very different view of the issues presented on this appeal from that set forth in the opinion of the court.

In my opinion this was an exceptionally well conducted trial. Two seasoned trial lawyers tried the case with care and skill. An attentive, scrupulously impartial Trial Judge presided with conspicuous ability. The unanimous jury verdict as to liability was clearly supported by the weight of credible evidence.

Indeed the defendant hospital did not on this appeal contest as to liability the legal sufficiency of the evidence or claim that the verdict was against the weight of evidence. The decision not to do so was clearly sound. Once the jury had determined the wrist drop occurred while plaintiff was in the intensive care unit, a determination fully supported by the evidence, it is difficult to see how any other verdict as to liability could have been reached in view of the abundant evidence that the defendant's personnel violated the hospital's rules concerning application of restraints and the total failure of the defendant to give any alternative explanation as to how such an injury could have occurred in a hospital unit specifi-

cally designed to provide maximum observation, monitoring and care.

As to the damages awarded, I agree that the amount seems high at first impression. However, when the record is carefully reviewed, it becomes apparent that credible testimony was presented that justified the award.

As the court's opinion points out, the defendant offered persuasive testimony that plaintiff had substantially recovered the use of her left wrist some time before the trial. On the other hand, two reliable witnesses, one of them an experienced registered nurse, testified that the disability continued until the trial. In short, a factual issue was presented, resulting in a jury determination that cannot fairly be said to be contrary to the weight of evidence.

The reasons assigned in the court's opinion for reversing the judgment as to liability seem to me strained and unpersuasive.

I find untenable the vague intimation that the jury did not understand that the Medical Malpractice Mediation Panel had unanimously found no liability. The panel report was read in full to the jury and explicitly included a finding of no liability. The report was marked as an exhibit and provided to the jury with the other exhibits at the beginning of deliberations. Although the summations were not transcribed, it can be safely assumed that defense counsel did not fail in his summation to stress the importance of the unanimous impartial finding by a doctor, lawyer and Judge that the hospital was not liable.

In his explanatory comment with regard to the panel report, the Trial Judge undoubtedly misspoke himself in his reference to "a recommendation of liability" when he clearly intended to describe a recommendation "with regard to" liability. No objection or request for clarification was made by defense counsel. The reason seems obvious. No one in that courtroom could have thought that the Judge's ambiguous phrase would confuse a jury which had just heard the report itself read in full. To believe it remotely possible on this record that the jury did not understand the nature of the panel's recommendation implies a view of the jury's judgment and intelligence that is little short of frightening.

Nor do I find any basis for criticism of the trial court in its refusal to give certain specific charges requested by the defendant. The carefully prepared charge set forth a comprehen-

sive, accurate, clear and balanced statement of the applicable rules of law. Most of the defendant's requests to charge were included in the charge, some of them in the very words that had been suggested by the defendant. Those specific requests not included in the charge represented the Trial Judge's reasonable judgment that they would disrupt the meticulous balance that he had so carefully sought to achieve.

The one clear error disclosed by this record occurred in connection with the court's response to the first question put by the jury: "Is a hospital liable for any injury to the patient while in its intensive care unit." Apparently misunderstanding the question, the trial court responded that the only injury claimed was that to the left radial nerve. This omission was excepted to by the defendant and I agree that the jury was entitled to a clear response to that question.

However, in the court's response to the later inquiry put by the jury, he addressed precisely this issue in terms that could not be improved upon for clarity. He once again described the plaintiff's burden to prove negligence, accurately defined the hospital's duty of care, and went on to say: "If you find that the hospital's act was not contrary to that standard of care, you will find that the hospital was not negligent."

No juror hearing that charge could possibly have concluded that the hospital was "liable for any injury occurring to the patient while in its intensive care unit."

I am baffled by the criticisms in the court's opinion of the trial court's response to the second inquiry put to it by the jury. That question was:

"We are in agreement that an injury to the radial nerve occurred to this plaintiff while in the intensive care unit.

"For the hospital to be liable, is it necessary to agree that this wrist restraint caused this injury.

"Are we limited to consider the wrist restraint only as the causative agent of the injury to the plaintiff's radial nerve?"

The trial court responded to this inquiry by repeating a portion of the original charge, starting with the section directly responsive to this inquiry but going on to place it in the context of other relevant rules of law.

Although not explicitly explained, the trial court's reason for doing so is not difficult to discern. The inquiry to him reported an agreement by the jury that the injury occurred to the plaintiff while in the intensive care unit and went on to

ask a question with regard to the necessity for establishing a causal relationship. Particularly in view of the prior question asked by the jury, and defense counsel's objection to his apparently nonresponsive answer, the trial court understandably feared that an answer limited to the question of cause might leave in doubt the obligation of the plaintiff to establish negligence. Surely this very reasonable judgment does not merit any criticism.

The court's opinion states that "Nowhere was there a specific answer to the jury's inquiry." This comment is simply not so, as the opening paragraphs of the Judge's response clearly demonstrate:

"If you find that the hospital did, in fact, negligently apply restraints to the left wrist of the plaintiff and, therefore, did, in fact depart or deviate from the accepted standards in the community, there, again, the plaintiff would have to prove that the deviation or departure from such accepted standard was the direct or the proximate or the contributing cause of the injuries that were sustained by Helene Schwabach.

"Now, an act or omission is a proximate cause of an injury if it was a substantial factor in bringing about the injury, that is, if it had such an affect [sic] in producing the injury that reasonable people would regard it as a cause of the injury."

If this did not constitute a specific answer to the jury's inquiry, I would like to know what would be required to constitute a specific answer. Surely it cannot seriously be urged that this response did not adequately inform the jury that: "For the hospital to be liable [it] is necessary to agree that this wrist restraint caused this injury."

The court's opinion goes on to suggest that the jury's inquiry "made clear its confusion" and that "they should have been instructed on the precise subject upon which they were in doubt."

It is true that on some occasions a jury's inquiry is the result of some lack of clarity in the Judge's original charge or suggests a confusion that requires alternative and supplemental language. Sometimes, and perhaps more often, it reflects a failure of memory on the part of one or more jurors after a period of deliberation, or even a desire to be absolutely certain as to the instruction. In the usual situation, it is surely for the Trial Judge to determine what is required on the basis of his closer relationship to the situation.

In this case the original charge could not have been clearer on the question put. The restatement by the trial court of the paragraphs quoted above was by any standard a full, precise and lucid response to the inquiry. Significantly, defense counsel, not shown in this record to be reticent about registering objections, did not in any way object to the adequacy of the trial court's response to the inquiry as to cause, an omission pointed up by his objection to a separate aspect of the court's response on a ground that has been virtually, and appropriately, abandoned on this appeal.

In short, the court's opinion presents the perplexing and unusual situation of a judgment being reversed in part on the basis of a judicial response to an inquiry from the jury that was in fact a correct statement of the applicable rule of law and to which there was no objection.

For the reasons stated above, the judgment of the Supreme Court, New York County, entered January 30, 1979, should be affirmed in all respects.

MURPHY, P. J., BIRNS and LANE, JJ., concur with BLOOM, J.; SANDLER, J., dissents in an opinion.

Judgment, Supreme Court, New York County, entered on January 30, 1979, reversed, on the law, vacated, and the case remanded for a new trial, with $75 costs and disbursements of this appeal to abide the event.