**Ralph A. APPLEGATE, Plaintiff,**

v.

**DOBROVIR, OAKES & GEBHARDT, Defendants.**

Civ. A. No. 83–3534.

United States District Court, District of Columbia.

Dec. 2, 1985.

Ralph A. Applegate, pro se.

John T. Coyne, Jordan, Coyne, Savits & Lopata, Washington, D.C., for defendants.

MEMORANDUM

OBERDORFER, District Judge.

I.

Plaintiff Ralph A. Applegate, appearing *pro se*, brought this action against his for-

mer counsel William Dobrovir and his law firm, Dobrovir, Oakes & Gebhardt. The complaint alleges essentially that defendants, representing plaintiff at no cost to him, failed to properly conduct an action brought by plaintiff against the government officials who fired him after he had attracted public attention by attacking alleged waste in government procurement. *See Applegate v. Weinberger*, No. 79–0145 (D.D.C. filed Jan. 12, 1979).

Plaintiff is a former employee of the Department of Defense. He was employed as a Mechanical Engineer in the Defense Construction Supply Center (DCSC) in Columbus, Ohio, until November 1, 1976, when he was removed from his position. Second Amended Complaint at ¶ 5 (filed May 16, 1984). In April, 1978, after plaintiff lost his internal appeal of his removal, plaintiff sought a lawyer to represent him in a suit against the DCSC in federal court. Amended Complaint at ¶¶ 9, 10 (filed Dec. 13, 1984).[1] Plaintiff "sought lawyers in writing, in person, by telephone in Ohio cities; Iowa; Maryland; New York City; Houston; San Francisco; Pittsburgh; Washington, D.C.; and other locations on a number of occasions during 1978 to no avail." Amended Complaint at ¶ 10.

Defendants began their representation of plaintiff in December, 1978, after the Lawyer Referral and Information Service of the District of Columbia Bar asked the firm to consider representing plaintiff. Memorandum of Points and Authorities in Support of Defendant, Dobrovir, Oakes & Gebhardt's Motion for Summary Judgment (Defendants' Mem.) at 1 (filed March 14, 1985); Second Amended Complaint at ¶ 6. The Fund for Constitutional Government, a public interest foundation, agreed to finance partially defendants' representation of plaintiff. The rest of plaintiff's representation was provided by the law firm on a *pro bono* basis. Affidavit of William A. Dobrovir at ¶¶ 3, 4 (filed March 14, 1985).

On behalf of plaintiff, defendants filed Civil Action No. 79–0145 on Jan. 12, 1979. The suit sought to vindicate plaintiff's right as a public employee to speak out publicly on the issue of waste in federal procurements. Three and one-half years of litigation then ensued. During the course of the litigation, defendants responded to the government's, and filed their own, cross-motion for summary judgment, and argued for, and ultimately obtained, *de novo* fact-finding by the court on the first amendment issue raised, thus necessitating discovery. *Id.* at ¶¶ 5, 6. During discovery, defendants filed numerous motions to compel. *Id.* at ¶¶ 7, 8. Defendants then briefed a second round of cross-motions for summary judgment. *Id.* at ¶ 9. The court granted the government's cross-motion as to plaintiff's fifth amendment and 42 U.S.C. § 1985 claims. *Id.* The court determined the first amendment claim to require trial. Defendants thus engaged in further, expedited discovery. During the entire course of discovery, defendants took 2030 pages of deposition testimony. Defendants' Mem. at 4 n. 2 (citing Record from C.A. 79–0145). Shortly before trial, defendant learned that certain potentially relevant documents held by the government had been destroyed. Dobrovir Affidavit at ¶ 11. The firm moved for imposition of sanctions. *Id.* Before that motion was decided, plaintiff agreed to settle his claim for $28,500. *Id.*

Plaintiff's claims in this action arise out of this original representation. Plaintiff's claims are essentially two-fold: (1) professional malpractice; and (2) fraud and tortious misrepresentation, allegedly inducing Mr. Applegate to settle his case to his detriment on the eve of trial. *See* Second Amended Complaint, *supra*.

By Order dated June 14, 1984, the Court set the instant case for trial on September 18, 1985, and referred it to United States Magistrate Arthur L. Burnett to conduct discovery and pretrial proceedings. In

---

1. Plaintiff filed three different complaints in this action. The Second Amended Complaint, *supra*, is the most recent.

March, after extensive discovery, defendants filed, and in April, 1985, the Magistrate heard, a motion for summary judgment. Meanwhile, the Magistrate had conducted a pretrial conference and filed a pretrial order so that the case was ready for trial on September 18. However, on September 10, 1985, the Magistrate filed a report with the Court recommending that defendants' motion for summary judgment be granted. Memorandum Opinion, Report and Recommendation (Mem.) (filed Sept. 10, 1985). In light of Magistrate Burnett's recommendation, the Court postponed the trial and, on the day it was to have begun, held an extended hearing on the summary judgment motion. *See* Transcript of Proceedings (Tr.) (September 18, 1985). Considering the motion *de novo* with the benefit of Magistrate Burnett's helpful memorandum (a copy of which is attached hereto and made a part hereof), the Court is persuaded that undisputed facts establish that the motion is well taken. The accompanying order will grant defendants' motion for summary judgment.

## II.

### A.

■ At the September 18 hearing the parties raised two preliminary, technical questions. Defendants urged that the action be maintained against the law firm (as well as Mr. Dobrovir) despite the rule in the District of Columbia that a partnership is not an entity capable of suing or being sued. Defendants invoke an Ohio statute as authority for their position. Ohio Rev. Code § 2307.24. They claim that since this action was commenced in Ohio, plaintiff's domicile, the suit could have been maintained there against the partnership.[2] They refer to Fed.R.Civ.P. 17(b) which says that an individual's capacity to sue is determined by the law of his domicile. Plaintiff

does not challenge defendants' suggestion, and there is strong authority supporting the Magistrate's recommendation, that Ohio law be applied. *Van Dusen v. Barrack*, 376 U.S. 612, 638–39, 84 S.Ct. 805, 820–21, 11 L.Ed.2d 945 (1964); *see also Walko Corp. v. Burger Chef Systems, Inc.*, 554 F.2d 1165, 1167 (D.C.Cir.1977). Accordingly, the case will be maintained here against both Mr. Dobrovir and the partnership, as it would have been if the case had not been transferred from the District Court in Ohio.

### B.

■ Plaintiff questions the authority of the Magistrate to entertain, and to make recommendations on, the summary judgment motion. Plaintiff's Objection to Magistrate Burnett [sic] Memorandum Opinion, Report and Recommendation of September 10, 1985 (Plaintiff's Objection) (filed Sept. 17, 1985). However, there is clear statutory authority for this role for the magistrate. *See* 28 U.S.C. § 636.[3] While the order of reference to conduct pretrial proceedings did not specifically authorize the Magistrate to hear and make recommendations about dispositive motions, to do so is an authorized element of pretrial proceedings. 28 U.S.C. § 636(b)(1)(B). Moreover, Mr. Applegate had notice of, and participated in, the summary judgment proceedings before the Magistrate. At this late date, he has no valid objection to the Court's having the benefit of the recommendation developed from those proceedings. Because plaintiff has raised written objections to the Magistrate's Report, the Court will decide the summary judgment motion *de novo*. 28 U.S.C. § 636; Tr. at 7–8. The bulk of plaintiff's objections address the merits of the Magistrate's Report. These concerns have been received and considered.

---

**2.** The case was transferred from the Southern District of Ohio to this court under 28 U.S.C. § 1404(a) for the convenience of the parties and in the interest of justice.

**3.** Specifically, this section provides that:

a judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion....

28 U.S.C. § 636(b)(1)(B).

## III.

### A.

On the malpractice issue, defendants contend, and the Magistrate recommends, that the motion be granted because it is well-established that the plaintiff in such a case has the burden of establishing the standard of care and of proving that the defendants failed to meet it. Defendants' Mem. at 8–22; Mem. at 2–11. Yet in this case, despite numerous opportunities and great effort to locate an expert willing and able to testify on his behalf with respect to the standard of care and defendants' departure from it, plaintiff has proffered none.

Plaintiff explains that he has contacted numerous potential expert witnesses, without success. He does not claim that he lacks means to engage an expert, only that none has been willing to appear. In addition, plaintiff questions the necessity for expert testimony to establish his prima facie case. If one is nevertheless needed, he suggests that the Court appoint one. Plaintiff's Objection at 2.

### B.

As the Magistrate correctly observes, Mem. at 3–6, it is well established in this district that in legal (as well as medical) malpractice cases, expert testimony proving the applicable standard of care is an essential element of plaintiff's prima facie case. *E.g., Eibl v. Kogan,* 494 A.2d 640 (D.C.App.1985); *O'Neil v. Bergan,* 452 A.2d 337 (D.C.App.1982).[4] This Court once permitted a legal malpractice claim to go to the jury despite plaintiff's failure to offer expert testimony only to have the judgment for plaintiff reversed and remanded. *Hozie v. Rykhus,* No. 76–2272 (D.D.C. April 14, 1978), *rev'd,* 610 F.2d 999 (D.C. Cir.1979) (unpublished). This is also the law in Ohio. *McInnis v. Hyatt Legal Clinics,* 10 Ohio St.3d 112, 461 N.E.2d 1295 (1984); *Bloom v. Dieckmann,* 11 Ohio App.3d 202, 464 N.E.2d 187 (1983).

Both Ohio and the District of Columbia recognize the "common knowledge" exception to the general rule that a legal malpractice action must be supported by expert testimony. *O'Neil, supra,* provides:

> [I]n a legal malpractice action, the plaintiff must present expert testimony establishing the standard of care unless the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge.

452 A.2d at 341 (citations omitted).

■ The complexity of Mr. Applegate's first amendment claim against the government, the very extensive pretrial preparations,[5] the several pretrial rulings by the court, and the legal and practical difficulty of second-guessing an eve-of-trial settlement,[6] make it obvious that the malpractice issue was not cognizable by layman judging on the basis of common knowledge and common sense, unaided by expert testimony. Moreover, whether defendants should have given more attention to what appears to be cumulative evidence tendered by plaintiff on the eve of trial is also a ques-

---

**4.** *See Bonhiver v. Rotenberg, Schwartzman & Richards,* 461 F.2d 925, 928 (7th Cir.1972); *Dorf v. Relles,* 355 F.2d 488, 492 (7th Cir.1966).

**5.** It is undisputed that defendants took 16 pretrial depositions and spent approximately 2000 hours of attorney time and 800 hours of law clerk and paralegal time on the case. In May, 1984, it devoted 374 hours and in June, 483 hours, in preparation for a trial firmly set by Chief Judge Robinson to begin on June 14, 1984. Tr. at 21. In addition to all the other preparations, defendants had prepared a 55-page outline of their proposed cross-examination of Mr. Applegate's protagonist, General Higgins, as well as a detailed outline of Mr. Applegate's testimony. Tr. at 45. There was also a list of 78 exhibits prepared for offering on Mr. Applegate's behalf. Mem. at 12.

**6.** The settlement agreement was evidenced by a two to three page legal size document reciting the contentions of the parties, the fact of an agreement, disavowal of any concessions about responsibility, and Mr. Applegate's acceptance of $28,500 in full settlement. The agreement was signed by Mr. Applegate personally, as well as by counsel, and was approved by Judge Robinson, who had supervised the pretrial and was on the eve of trying the case without a jury. Tr. at 31.

tion requiring expert testimony. *See* Mem. at 7; Tr. at 38.

■ To the extent that plaintiff claims defendants breached their professional duty by failing to introduce specific items of evidence at trial, his claim must fail. Questions of tactics are in the lawyer's discretion. According to the court in *Frank v. Bloom*, 634 F.2d 1245, 1256–57 (10th Cir.1980):

> The fact, . . . that the attorney in the heat of the trial disregards the direction of the client as to trial strategy or activity does not give the client a right of action against the attorney. After all, it is the duty of the attorney who is a professional to determine trial strategy. If the client had the last word on this, the client could be his or her own lawyer. Therefore, an attorney does not ordinarily violate his duty to the client by rejecting a client's suggested tactic.

■ The only fact proffered by plaintiff which even resembles the kind of occurrence which a jury might appraise without an expert relates to some correspondence between plaintiff and his attorneys which apparently was lost or misplaced by the attorneys. But, it is undisputed that this correspondence did not contain evidence which would be necessary to prove a fact at trial. *See* Tr. at 84–92. In any event, whether it would or would not have been usable or necessary, and whether the loss of the correspondence was in any way causally connected to any consequence, would be a matter beyond the ken of a jury operating without the assistance of an expert witness.

■ At the hearing on the motion for summary judgment, the Court *sua sponte* raised the question of whether the Court should appoint an expert witness for Mr. Applegate because he was proceeding *pro se* and, in challenging military procurement, was representing an unpopular cause and therefore faced difficulty in finding a witness willing to testify on his behalf. On reflection and after considering supplemental memoranda filed on the subject, the Court is persuaded that, even though there may be authority to appoint an expert in a civil case, and to tax the cost of the expert's services, Fed.R.Evid. 706 [7] this case does not present the "compelling circumstances" which would make appointment of an expert by the court appropriate. *See United States Marshals Service v. Means*, 741 F.2d 1053 (8th Cir.1984) (en banc). Here, plaintiff has the burden of proof. He is not indigent. He does not claim that he failed to obtain an expert because he could not afford one. It may well be that just as plaintiffs suing doctors have difficulty persuading other doctors to testify against a colleague for fear of reprisal, some lawyers may also be unwilling to testify against some colleagues. But, there is little basis for such a concern here. Although plaintiff's cause may be unpopular, it is judicially noticed that defendants have represented equally unpopular causes in this Court. In sum, the Rule 706 authority to appoint an expert is discretionary. Whatever may be the authority or responsibility of a court to appoint an expert in some civil cases, there is no justification for appointing one here.

### C.

Plaintiff also contends that the defendants were guilty of fraud in inducing him to settle his case against the government. In appraising the fraud claim, the Court is governed by the principle that clear and convincing evidence is a requisite to a successful fraud claim,[8] and by the strong policy favoring and protecting the settlement of controversies in litigation. The

---

7. Defendant's supplemental memorandum suggests that the parties share any cost of an appointed expert, but offers to bear the entire cost if plaintiff is unable to pay a share. Defendant's Supplemental Memorandum on the Issue of a Court Appointed Expert at 10 (filed Sept. 30, 1985).

8. *Dunn Appraisal Co. v. Honeywell Information Systems*, 687 F.2d 877 (6th Cir.1982); *Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C.Cir. 1966); *Hogan v. Wright*, 356 F.2d 595 (6th Cir. 1966); *Willis v. Cheek*, 387 A.2d 716 (D.C.App. 1978).

Court is also cognizant of the elements a plaintiff alleging fraud must plead and prove. These are:

(1) a false representation; (2) in reference to a material fact; (3) made with knowledge of its falsity; (4) with the intent to deceive; and (5) causing one to act upon the representation.

*Mills v. Cosmopolitan Insurance Agency, Inc.*, 424 A.2d 43, 46 (D.C.1980) (citing *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.App. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978)).

The fraud claim in this case is a convoluted one. The fees and expenses to finance the underlying case were not paid by Mr. Applegate, but by a foundation. Dobrovir Affidavit at ¶¶ 3, 4. On the eve of trial, and while the settlement offer was "on the table," Mr. Dobrovir told plaintiff that the law firm had run out of money, but that the firm was prepared to go to trial if plaintiff did not accept the offer. Dobrovir Affidavit at ¶ 13(b). He was also told that he was likely to lose the case by "the thickness of a fingernail." Mem. at 13.

■■■ It is apparent from undisputed evidence that the grant made to fund the law suit was exhausted and that plaintiff knew or should have known that was the fact as of the eve of trial. *See* Plaintiff's Pretrial Brief at 40 (filed July 22, 1985); Dobrovir Affidavit at ¶ 13. Because the statement that the funds had run out was true in fact, it cannot serve as the basis for a claim of fraudulent misrepresentation. Plaintiff also claims that he thought that the foundation which had funded the case up to that time would, if asked, provide additional funds. He supports this allegation with his own affidavit filed August 22, 1984, purporting to quote Anne Zill, President of the Fund for Constitutional Government. As the affidavit stands, it is inadmissible hearsay, and plaintiff has proffered no affidavit from Zill, herself. Consequently, plaintiff's allegation that the Fund would have provided additional funding had it been asked is mere speculation. Such speculation is not the clear and convincing evidence required to maintain a fraud claim.

■■■ Plaintiff further testified that he did not believe, and therefore did not rely on, defendants' representation that they were prepared to proceed to trial without additional funding. Plaintiff's March 29, 1985 Supplemental Affidavit and Statement Of Material Facts As To Which There Are Genuine Issues at 3 (filed April 3, 1985). But, it is apparent that defendants had no realistic alternative to trying the case if plaintiff had rejected the settlement. The defendants had conducted hundreds of hours of preparation; Chief Judge Robinson had set a firm and imminent trial date. Plaintiff suggests no theory on which defendants could have avoided a trial, even if they had wanted to avoid it. Most importantly, however, plaintiff cannot sustain a fraud claim on a representation which he did not believe and on which he did not rely.

■■■ Finally, plaintiff attempts to inject into his fraud claim the fact that defendants advised him on the eve of trial that in their opinion he was likely to lose "by the thickness of a fingernail." But again, there is no proffered evidence to show that these statements were anything more than a professional opinion. The validity of this opinion, right or wrong, and especially as to a future event, is not a fact susceptible to being proved by clear and convincing evidence. *Cf. Chaplin v. United States*, 157 F.2d 697 (D.C.Cir.1946) (a claim of false pretense must relate to a past event or existing fact, not future event). Moreover, even if the opinion given appeared questionable, expert opinion would be required to establish whether the opinion was, in fact, reasonable.

Viewed in perspective, it is apparent that plaintiff's fraud claim is a variation of his malpractice claim. No prima facie case can be established on either count without expert testimony. Moreover, because the alleged fraudulent misrepresentations were either true in fact or not relied upon, expert testimony could not supply the clear and convincing evidence required to sustain a prima facie case for plaintiff on the fraud

issue. Accordingly, the accompanying order will grant defendants' motion for summary judgment.

## APPENDIX

## MEMORANDUM OPINION, REPORT AND RECOMMENDATION

While the defendant throughout the record in this case has been referred to as Dobrovir, Oakes and Gebhardt, a law partnership, it appears that the only proper defendant before the Court is William A. Dobrovir, a general partner, the only individual who was served with the summons and complaint and who has, in fact, appeared and defended against the complaint in this suit. Before the Court at this time is the defendant's motion for summary judgment as to each of the two (2) causes of action contained in the plaintiff's Second Amended Complaint, the first cause of action asserting legal malpractice (negligence) and the second cause of action asserting fraud.

### The Legal Malpractice Cause of Action

This is a diversity action which was originally filed in the Southern District of Ohio and later transferred to this Court under 28 U.S.C. § 1404(a) for the convenience of the parties and in the interest of justice. In this situation a transferee court, the District Court for the District of Columbia, is obligated to apply the law that would have been applied by the local courts of the State, in this case Ohio, in which the action was originally filed. *See, Van Dusen v. Barrack*, 376 U.S. 612, 638–39, 84 S.Ct. 805, 820–21, 11 L.Ed.2d 945 (1964). A change of venue under Section 1404(a) generally is to be regarded, with respect to State law, as merely a change in courtrooms. *See also, Walko Corp. v. Burger Chef Systems, Inc.*, 554 F.2d 1165 (D.C.Cir. 1977). Thus, the Magistrate is of the view that we must look to the law of Ohio as to the legal malpractice claim to determine if the granting of summary judgment would be proper in this case based on the failure of the plaintiff to have an expert witness to testify as to the standard of care required

of the lawyer in the context of pretrial investigation and discovery and trial preparation of a civil case involving constitutional claims of dismissal from Federal service in retaliation for making public disclosures and complaints to superiors concerning government waste and excessive pricing in procurements involving military expenditures, and whether the attorney's conduct in this case was a breach of that standard. At the final pretrial conference of August 1, 1985 and in a number of filings with the court prior to that time, plaintiff has stated he has no expert and that the nature of the conduct of the lawyers in this case on which he bases his claims of negligence was so egregious and so plain that it is within the ken of jurors as laymen to understand. Thus, Mr. Applegate has repeatedly taken the position that no expert witness is necessary.

Our research has resulted in our finding three (3) relevant cases from Ohio. In *McInnis v. Hyatt Legal Clinics*, 10 Ohio St.3d 112, 461 N.E.2d 1295 (1984), the Supreme Court of Ohio observed that generally, expert testimony would be required in regard to professional standards of performance, although in that case it concluded that expert testimony was not necessary, observing that the claimed breach of professional duty was well within the common understanding of the laymen on the jury. In that case the client had specifically requested that none of the divorce proceedings be in a newspaper since he lived in a small community where the residents were unaware that he was not married to the woman with whom he was living at the time, and the attorney gave the client a written assurance that no notice or information would be in any newspaper. The Supreme Court of Ohio observed that the attorney should have informed his client of the legal necessity of publication.

In *Bloom v. Dieckmann*, 11 Ohio App.3d 202, 464 N.E.2d 187 (Ohio App.1983), the Court of Appeals of Ohio, Hamilton County, in what it characterized as a case of first impression, stated:

"The question whether expert opinion is necessary to support a claim of legal malpractice is one of first impression in Ohio. The issue, however, has been considered by a number of other jurisdictions. As stated in Annotation (1982), 14 A.L.R.4th 170, 173:

‘ * * * [I]t now appears to be the rule that expert evidence is required in a legal malpractice case to establish the attorney's breach of his duty of care except in cases *where the breach or lack thereof is so obvious that it may be determined by the court as a matter of law, or is within the ordinary knowledge and experience of laymen * * **.’ (Emphasis added.) *

We find this to be a sound principle and determine that given the nature of appellant's malpractice claims, appellee's alleged negligence was neither within the ordinary knowledge of the layman nor so clear as to constitute negligence as a matter of law. Expert testimony was therefore necessary to support a cause of action for malpractice." 464 N.E.2d at 188.[1]

See also *Jablonski v. Higgins*, 6 Ohio Misc.2d 8, 453 N.E.2d 1296 (Court of Common Pleas of Ohio, Cuyahoga County, 1983), referring to experts' opinions attached to the cross-motions for summary judgment, and setting forth the elements of a legal malpractice case as:

1. There was an attorney-client relationship.

2. There were sufficient facts to show that the attorney's alleged misconduct caused the plaintiff's injury.

3. The attorney had breached his duty to provide competent legal services.

4. The damages which the plaintiff sustained were the proximate result of the attorney's alleged misconduct.

While the Magistrate is of the view that Ohio law, as set forth above, should apply and govern in this case, even were we to apply the District of Columbia law, we would reach the same results, as the principles applicable to the need for expert witnesses in legal malpractice cases under the District of Columbia law are essentially the same. The leading case in the District of Columbia is *O'Neil v. Bergan*, 452 A.2d 337 (D.C.App.1982). Starting from the proposition that the elements of an action for professional negligence are the same as those for an ordinary negligence action, and that a lawyer must exercise that degree of reasonable care and skill expected of lawyers acting under similar circumstances, and observing that in the medical malpractice context, the rule in this jurisdiction is that a plaintiff must present expert testimony establishing the applicable standard of care unless common knowledge warrants an inference of negligence, the Court in *O'Neil* concluded that the same rule should apply in attorney malpractice actions. The District of Columbia Court of Appeals there stated:

"Specifically, we adopt the widely followed rule that, in a legal malpractice

---

* Note that the emphasis was in the original text.

1. In this case the trial court had granted an attorney's motion for summary judgment on a counterclaim filed in response to a suit for attorney's fees where the client had alleged legal malpractice. In support of his motion the attorney had filed an affidavit expressing his professional opinion as an attorney that "all legal services rendered by me to the defendant * * * were done in a diligent, careful and prudent manner which conformed to the highest degree of legal care and professionalism." Appellant did not offer any expert testimony on the issue of appellee's competency either in support of his memorandum in opposition to the motion for summary judgment or at the hearing on the

motion. Instead, he presented an opposing affidavit expressing his opinion as a layman which contained general allegations concerning the lawyer's negligence. That is essentially what we have in this case with only Mr. Applegate's general allegations of negligence, and summary judgment should be granted in this case also, unless the conduct about which he complains can be determined by the court, as a matter of law, as constituting negligence, such as failing to answer a complaint timely or the filing of a lawsuit before the obvious statute of limitations expires, or the matter is a dereliction within the ordinary knowledge and experience of laymen that they can understand without expert assistance.

action, the plaintiff must present expert testimony establishing the standard of care unless the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge." 452 A.2d at 341. As examples of the situations falling within the "common knowledge" concept, the *O'Neil* Court referred to the actions of a lawyer in allowing the statute of limitations to run on a client's claim or permitting entry of a default against a client. The *O'Neil* Court concluded, however, that where the subject matter of the case and the substantial amount of legal work done by the attorney makes the case too complex for jury analysis without expert help, then the plaintiff must present an expert witness or witnesses.[2] If a case is sufficiently complex as to require an expert witness, the failure to name an expert witness by the time of the final pretrial conference, can justify the granting of summary judgment against the plaintiff. See *Eibl v. Kogan and Washington Hospital Center*, 494 A.2d 640 (D.C.App.1985), affirming the trial court's granting of summary judgment in the context of a medical malpractice case.

Turning to the facts in this case, the issue is whether it is a case in which a jury can determine that the attorneys' handling of the case amounted to legal malpractice, without the benefit of expert testimony on the applicable standard of care. The Magistrate has elaborated extensively upon the facts and the contentions of the respective parties in a lengthy Pretrial Order also filed this date, to govern the trial of this case in the event the Court does not adopt this Report and Recommendation. It is indeed unfortunate that the plaintiff, Mr. Applegate, has not had the legal assistance of counsel in this case to aid him in marshalling the facts, in setting forth his contentions, and in presenting his judicial precedents. As a result, the Magistrate has exercised an even greater degree of care in reviewing the court record in this case in preparing the Pretrial Order and this Memorandum Opinion and Report and Recommendation. The Magistrate will not endeavor to repeat here the extensive elaboration in the Pretrial Order, but will merely summarize the salient factual matters essential to resolve the pending summary judgment motion.

Defendant William A. Dobrovir has characterized the underlying civil suit as a complex one involving constitutional law issues relating to the First Amendment protections for public employees in which he and a number of other lawyers in his law firm represented Mr. Applegate for more than three and one-half years, from December, 1978 to June 14, 1982 when his case, C.A. No. 79–0145, was settled. In addition to examining and reviewing in detail a twenty-four (24) volume administrative record, which took up six (6) feet of file space, the defendant has characterized the law firm's efforts on behalf of Mr. Applegate as involving comprehensive discovery, which included sixteen (16) oral depositions and seven (7) separate written requests for documents, admissions and interrogatory responses. Depositions involved some 2,030 pages of testimony. The defendant filed a cross-motion for summary judgment on behalf of Mr. Applegate in the underlying case, an opposition to the U.S. defendants' motion for summary judgment in that case, motions to compel discovery and other pleadings and memoranda in that case. The defendant law firm has pointed out that two sets of cross-motions for summary judgment were filed in the underlying case

---

**2.** See also *Frank v. Bloom*, 634 F.2d 1245, 1256–57 (10th Cir.1980), discussing the need for competent expert testimony. Whether a litigation attorney has sufficiently investigated and properly evaluated a client's case, particularly in a complex case, is a matter to be determined based on expert testimony. See, *e.g., Kirsch v. Duryea*, 146 Cal.Rptr. 218, 21 Cal.3d 303, 578 P.2d 935 (Cal.1978). (The extent to which an attorney, in the exercise of due care, will advance funds to hire investigators, depose witnesses or perform tests on a client is not a matter of common knowledge.) See also *Hozie v. Rykhus*, 610 F.2d 999 (D.C.Cir.1979) (unpublished memorandum opinion) reversing the judgment of the trial court in a legal malpractice case where the judge had allowed the case to go to the jury without the benefit of legal expert testimony.

containing a combined listing of more than one hundred and twenty-five material issues of fact, and has aptly observed that whether the conduct of Mr. Dobrovir and his associates in identifying and investigating these facts fell below the applicable standard of care is not susceptible to a common knowledge analysis, in the view of this Magistrate. Defendant Dobrovir further claims the law firm devoted close to 2,000 hours of partner and associate time to the case and close to 80 hours of law clerk time. The defendant has asserted that a lawyer has professional discretion in determining the means by which a matter should be pursued, citing Rule 1.3 of the ABA Model Rules of Professional Conduct, and assert that they law firm competently and vigorously represented Mr. Applegate.[3]

Plaintiff, Mr. Applegate, on the other hand, has claimed that Mr. Dobrovir and his associates failed to follow his oral and written instructions as to what investigation to undertake, what persons to interview, and what depositions to take, and what documents and other exhibits to review and present at the trial of his case against the United States in Civil Action No. 79–0145. In a conclusory fashion he has asserted that Mr. Dobrovir's egregious acts, including the destruction of his letters of instructions and refusal to review documents he offered as exhibits to show that this supervisors were lying in claiming they terminated him from his employment with the government for insubordination and off-duty misconduct, are sufficient to establish negligence without expert testimony. Citing *Woodruff v. Tomlin*, 616 F.2d 924 (6th Cir.1980), to the effect that an

attorney's failure to interview witnesses suggested by a client and to follow up on leads do not require expert witnesses, plaintiff has contended that his testimony and other evidence he will present will suffice. But the court in *Woodruff* also fully recognized that an attorney cannot be held liable for legal malpractice for refusing to use trial tactics suggested by a client, in the prudent exercise of the lawyer's professional judgment, 616 F.2d at 928, 930 & n. 1.[4] Here, with respect to the additional exhibits presented by Mr. Applegate a week before the trial date to show that his superiors were lying in connection with procurement matters in the disputes which led to Mr. Applegate's termination for insubordination and off-duty misconduct, defendant has claimed this evidence was, at most, cumulative and was not central to the constitutional theory of the case. Indeed, the minutiae of detail of the sundry procurement matters may well have distracted from the significant evidence in the case of retaliation or may have been irrelevant, even if they showed waste, excessive costs and expenditures of funds and that his superiors were lying, if other substantial evidence showed that he, Mr. Applegate, had been insubordinate in circumstances warranting his removal. To suggest these possibilities in the context of the constitutional tort theory involved and the need to evaluate its evidentiary worth in the context of the other proposed testimony defendant Dobrovir intended to present and the some seventy-eight (78) exhibits merely highlights the need for legal expert testimony in this case and shows that the issues Mr. Applegate wishes to litigate as

---

3. The Supreme Court of the United States in the context of dealing with criminal indigents has observed that counsel may disregard a client's suggested legal arguments when not in accord with counsel's professional evaluation. *See, Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

4. While a refusal to review certain evidence or to follow up on leads regarding witnesses, at the request of the client, may be actionable where central to the issues in a case, it is the Magistrate's view that a failure to follow a client's

instructions in minute detail with reference to tactical and strategy decisions to depose or not to depose certain witnesses whose testimony would be cumulative and repetitive, or to produce exhibits which may add nothing to a case, or to decide the order of proof at trial, should be immune from a claim of legal malpractice as involving the application of the professional judgment of counsel. If the client had the last word on these types of issues, the client could be his own lawyer. *Cf. Frank v. Bloom*, 634 F.2d at 1256–57.

to legal malpractice are beyond the ken of the ordinary layman.

From the Magistrate's detailed examination of Mr. Applegate's filings and his pretrial brief, it appears that he contemplates putting on testimony and documents describing in minute detail dozens of specific procurement matters and related events involving what he considers waste, excessive expenditures, and other wrongful conduct by his superiors at the Defense Construction Supply Center in Columbus, Ohio to show that they were lying when they claimed they terminated him for insubordination and off-duty misconduct. Thus, in his pretrial brief, he referred to the pretrial conference of June 27, 1985 before this Magistrate, where he discussed, even though he had submitted 151 pages of affidavit material on the projects, the "Sprayer Project" falsification, the "Thelma Gregory" falsification, and the alleged falsification in connection with the GAO phone calls received in 1975 by the Defense Construction Supply Center. It appears from the several conferences before this Magistrate and from Mr. Applegate's numerous filings that he wishes to use the instant case as a forum for each procurement matter in which he disagreed with his superiors in 1974, 1975 and 1976 in order to show what he has characterized as the "pathological lying" of the government officials who were responsible for his firing. Certainly how far one should go in presenting evidence of this type in a constitutional tort case involving First Amendment issues and whether the public disclosures by him were an effort to insulate himself as an employee from adverse action for unsatisfactory performance and insubordinate conduct or whether his termination was in retaliation for the exercise of legitimate "whistleblowing" in the public interest, requires the exercise of a finely balanced professional judgment of the advocate-litigator and specialized expert testimony as to whether the lawyer breached the appropriate standard of care in deciding on his trial tactics and strategy.

For the foregoing reasons, and based on the factors set forth above and as further elaborated upon in the Pretrial Order, the motion for summary judgment on the legal malpractice cause of action should be GRANTED.

### Fraud Cause of Action

Defendant William A. Dobrovir has asserted that the alleged statements concerning funding for the legal representation from the Fund for Constitutional Government are the only statements which Mr. Applegate now claims both to have believed true and to have relied upon in making his decision to enter into the settlement of his underlying case (C.A. No. 79-0145) against the United States Government. Defendant has cited to Mr. Applegate's deposition of October 11, 1984 at pages 47–49, 59, 64, 68, 73–74, and 125. Further, Mr. Applegate has acknowledged that Mr. Dobrovir told him during the final trial preparation that despite a shortage of grant funding to pay the attorneys for their time in trial, the law firm would continue to represent him and would proceed with the trial if he so desired. See Mr. Applegate's deposition at pages 48, 53, 60 and 77. Further, defendant's counsel have emphasized that Mr. Applegate has stated on a number of occasions that he believed at the time prior to his agreement to settle the case, that the seventy-eight (78) exhibits Mr. Dobrovir had identified for use at the trial on his behalf were sufficient to show the bad faith and lying of the government's witnesses, including his supervisors—see Mr. Applegate's deposition at pages 77, 121–22 and Plaintiff's answers to interrogatories Nos. 9 and 20—and that this, along with his own testimony and the testimony of the other witnesses to be presented in his case-in-chief, were enough for him to prevail. Thus, the defendant contends there was no detrimental reliance upon the statement that funding had been exhausted, even were it not true. The element of reliance is further undercut by Mr. Applegate's own deposition testimony that the decision to settle his underlying case was not the product of any threats, duress or coercion but rather, his own careful

analysis of the circumstances. See Mr. Applegate's deposition at pages 53 and 77.

Further, it is significant to note that Mr. Applegate in his pretrial brief filed July 22, 1985, concerning the funding issue stated: " * * * the record will show that Dobrovir knew or reasonably should have known, even in December, 1981, that the $30,000 grant funds provided by FCG in December, 1981, would have been exhausted at least by late March, 1982, and in fact were exhausted at least by early April, 1982." P. 40.

This statement by Mr. Applegate concedes the truth of the statement made by Mr. Dobrovir in early June, 1982 that the law firm had run out of money. Thus, literally the statement was true when made.[5] What Mr. Applegate complains about is that Mr. Dobrovir could have applied and obtained additional financing and that he failed to do so in order to induce him psychologically to enter into the settlement. But this is not false representation; rather, at most, it is what the defendant has characterized as part and parcel of his disbelief that the law firm would go to trial in the absence of continued funding and as "anticipatory abandonment."

Further, Mr. Applegate has alluded to Mr. Dobrovir's and Mr. Zacharias' opinion as to the likelihood of success to the effect that he would likely lose his case by the "thickness of a fingernail" and the implied false representation that his case was without merit. But Mr. Applegate has cited no material fact to show that such comments were anything but the attorneys' honest evaluation and assessment of the strength of Mr. Applegate's case. Such judgment matters do not constitute false representations. Further, Mr. Applegate has repeatedly protested that Mr. Dobrovir's statements that he would go to trial, notwithstanding the absence of funding, was unworthy of belief and he did not believe him. But the mere surmise of the plaintiff is insufficient to create a disputed issue of material fact sufficient to warrant a trial of the fraud cause of action. Mr. Applegate's belief as to what Mr. Dobrovir and Mr. Zacharias would have done had the case not been settled is not sufficient to create a factual dispute as to the state of mind of Mr. Dobrovir and Mr. Zacharias, where the record shows the extensive taking of depositions of numerous witnesses in May, 1982 in preparation for the trial, including the deposition of ten (10) Department of Defense witnesses on May 25–28, 1982, extensive trial preparation in the submission of an extensive trial brief, the listing of 78 exhibits, and the preparation of a 44 page statement of proposed testimony of the plaintiff himself. Mr. Dobrovir, in an affidavit of March 7, 1985, has represented, without contradiction, that his firm spent 374 hours of law time on the case in May and 483 hours in June, 1982. Further, in taking the position that he regarded the representation to proceed to trial at the time as insincere, plaintiff did not accept the representation as true nor did he rely on it to his detriment. He did not settle his case because he really thought that Mr. Dobrovir would proceed to trial. Indeed, his contention is exactly the opposite; he settled his case for $28,500.00 because, in his view, he thought Mr. Dobrovir would not proceed to trial.

This Magistrate is most conscious of the state of the law that where there are material issues of fact, the case must be tried, and that in fraud cases involving issues of state of mind and reliance, seldom will the granting of a motion for summary judgment be justified. But this does not mean that summary judgment should never be granted in a fraud case. See, e.g., McDonald v. Northwest Airlines, Inc., 630 F.2d 648 (8th Cir.1980). Surmises, speculation and subjective evaluations by the plaintiff not predicated on actual facts which can be presented as admissible evidence at trial should not require a trial and the

5. The motion for summary judgment here thus does not call upon the court to decide any issue of intent, knowledge or any other mental element frequently involved in fraud causes of action. The only question posed here is whether any false statement as to a past fact can be proven, prima facie, by Mr. Applegate.

diversion of substantial judicial time in the trial of a case predicated on such slim grounds, to the detriment of other pending cases of more substantial merit awaiting their turn to come to trial. The Magistrate is satisfied on the record in this case that there is no genuine issue as to any material fact. Accordingly, the Magistrate is of the view that this is an appropriate case for the granting of defendant's motion for summary judgment on the fraud cause of action. Rule 56(c), Federal Rules of Civil Procedure.

Based on the foregoing, it is hereby this 10th day of September, 1985 concluded that the defendant's motion for summary judgment should be granted as to both of plaintiff's causes of action and that judgment should be entered for the defendant and this case dismissed. IT IS SO RECOMMENDED.

ARTHUR L. BURNETT, SR.
United States Magistrate